Claude P. Bradbury and Catherine Bradbury v. Commissioner.Bradbury v. CommissionerDocket No. 609-68.United States Tax CourtT.C. Memo 1971-63; 1971 Tax Ct. Memo LEXIS 268; 30 T.C.M. (CCH) 266; T.C.M. (RIA) 71063; March 31, 1971, Filed. Glen McCarty, Commonwealth Bldg., Portland, Ore., for the petitioners. Gary R. DeFrang, for the respondent. DAWSONMemorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined the following Federal income tax deficiencies and additions to tax against the petitioners: TaxableYearDeficiencyAddition to Tax Sec.6653(b), I.R.C.19541957$ 140.53$ 70.2719582,701.301,350.6519592,161.271,080.641960283.89141.9519612,468.681,234.3419621,509.52754.761963340.34170.171964223.08111.541965159.49Petitioners have made certain concessions. They have also abandoned some minor issues by their failure to present any evidence pertaining thereto. The issues remaining for decision are: (1) Whether petitioner Claude P. Bradbury realized unreported income from grain sales during the taxable years 1957 through 1964 resulting in*270 deficiencies in petitioners' Federal income taxes for those years; (2) whether any part of the underpayment of tax for each of the years 1957 through 1964 was due to fraud with intent to evade tax; and (3) whether assessments of any deficiencies determined for the years 1957 through 1962 and the year 1964 are barred by the statute of limitations. Findings of Fact Some of the facts have been stipulated by the parties. The stipulation of facts and supplemental stipulation of facts, as well as the exhibits attached thereto, are incorporated herein by this reference. Claude P. Bradbury (herein referred to as petitioner) and Catherine Bradbury are husband and wife whose legal residence was Beaverton, Oregon, at the time they filed their petition in this proceeding. For the years 1957 through 1965 the petitioners filed their joint Federal income tax returns with the district director of internal revenue at Portland, Oregon. They reported their income on the cash receipts and disbursements method of accounting. 267 Interior Warehouse Company (herein referred to as Interior) operated a grain elevator at 800 North River Street, Portland, Oregon, which is located at the waterfront*271 docks on the Willamette River. Interior also maintained an office in downtown Portland. Interior's principal business consisted of the storage, loading and exporting of various types of grain to foreign countries. On or about May 1, 1962, Interior was sold to Peavey Grain Company (herein referred to as Peavey). Peavey continued to operate the grain elevator at 800 North River Street and the office in downtown Portland; and its principal business was the same as that of Interior. From January 2, 1957 to April 30, 1962, petitioner was employed in the capacity of assistant superintendent of Interior. Petitioner's principal duties consisted of directing longshoremen in the binning and grading of export grain prior to loading the grain on outgoing ships. Petitioner's duties for Interior were such that he supervised the work of Harlan Dobas and Harold Plaisted when they were employed at the elevator of Interior. From May 1, 1962 to August 14, 1964, petitioner was employed as assistant superintendent of Peavey, and performed the same duties as he had performed for Interior. Thomas Dean (herein referred to as Dean) was employed by Interior in the capacity of superintendent of the elevator*272 from 1953 until April 1, 1962. Harlan Dobas (herein referred to as Dobas) was employed by Interior from December 1954 to October 1960. From 1957 to October 1960, his position was clerk-chemist in charge of protein analysis and the recording thereof at the elevator. Harold Plaisted was employed by Interior and its successor, Peavey, during the period from May 1956 to some time prior to June 1962. Except for the period from late 1957 to October 1960 when he was assigned to Interior's office in downtown Portland, Harold Plaisted worked at the elevator. Lyle Plaisted, a cousin of Harold Plaisted, was employed as a switchman for the Spokane, Portland and Seattle Railroad Company at Portland at all times relevant hereto. The usual working hours for the employees at the elevator of Interior and its successor, Peavey, were from approximately 8 a.m. to 5:30 p.m. The volume of work at the elevator was such that the employees frequently worked past their usual quitting time and into the evening hours, and on Saturdays and Sundays. When it was necessary to put in overtime, the employees would work as late as 3 or 4 a.m., and work as many as 80 hours a week. Prior to June 1957, petitioner, *273 Harold Plaisted, and Dobas began sacking grain that had spilled along the conveyor belts of the grain elevator of Interior. The sacking of spillage in this manner continued for a period of approximately two months. A few times each week the sacked spillage was transported to Interstate Feed and Seed Company (herein referred to as Interstate) by Harold Plaisted, petitioner, or Dobas, and sold. The sacked grain was sold for $12 to $14 on each occasion. The money received from the sale of the sacked spillage was divided equally among petitioner, Dobas and Harold Plaisted. After the initial two-month period in 1957, Harold Plaisted brought Lyle Plaisted to the grain elevator and introduced him to Dobas and petitioner. It was agreed among the three employees of Interior that they would sell grain from Interior's elevator to Lyle Plaisted for $40 a ton. As a result of the agreement among Harold Plaisted, Dobas and petitioner, Lyle Plaisted purchased grain which had been wrongfully appropriated from the elevator of Interior or its successor, Peavey, for $40 a ton. The purchases extended over a period beginning on or before August 3, 1957, and ending on or about June 13, 1962. Dean became*274 a party to and started to share in the proceeds of the grain sales to Lyle Plaisted in late 1957. During the period that Lyle Plaisted acquired grain from Interior or its successor, Peavey, no one other than petitioner, Dobas, Dean and Harold Plaisted was a party to the grain sales to him. Lyle Plaisted transported the grain he was purchasing in a truck. The first three or four loads of grain which petitioner, Dobas and Harold Plaisted sold to Lyle Plaisted consisted of sacked grain. After the initial loads, bulk (rather than sacked) grain was sold to Lyle Plaisted. Part of the grain sold to Lyle Plaisted was grain which had spilled in and around the elevator. Some of the grain which spilled at the elevator had no value because of oil and water content. Most of this grain was 268 located near the car dumper of the elevator. On rare occasions, prior to April 1962, such as when a hydraulic cone broke, Lyle Plaisted would acquire this type of grain from Interior's elevator free of charge. The only grain Lyle Plaisted acquired from the elevator of Interior which he did not pay for was spillage which had no value because of its oil and water content. The grain sold to Lyle Plaisted*275 was stored in a bin at the elevator. When there was a load of grain for Lyle Plaisted to pick up, one of the parties to the grain sales, other than Dean, would notify Lyle Plaisted by telephone. Usually Lyle Plaisted would pick up the grain at or around 5 or 6 p.m., when the elevator was closing for the day. Occasionally he would pick up grain earlier in the day or in the evening if the employees of the elevator were working late. At least one of the parties to the grain sales to Lyle Plaisted was always present when he picked up grain. The weight of the grain Lyle Plaisted acquired was determined by weighing his truck empty at a scales and weighing the truck again after it was loaded. The truck was usually weighed at the elevator of Interior or its successor, Peavey. When traffic at the elevator scales was heavy, Lyle Plaisted would have his truck weighed elsewhere. When Lyle Plaisted's truck was weighed at the elevator, it would be weighed by one of the parties to the grain sales other than Dean. With the possible exception of one or two instances when payment was made at a later date, Lyle Plaisted paid for the grain he was purchasing before he left the premises of the elevator.*276 When his truck was weighed somewhere other than at the elevator, he made payment based upon the estimated weight of the grain acquired. When his truck was weighed at the elevator of Interior, Lyle Plaisted made payment for the grain, based upon the $40 per ton rate, to the person weighing his truck. Lyle Plaisted paid for the grain appropriated from Interior and its successor, Peavey, in currency. The security system at the elevator of Interior and its successor, Peavey, was furnished by American District Telegraph and was known as an ADT system. An ADT card was required to gain access to the elevator when it was closed. An ADT card contained the name and number of a person authorized to enter the elevator when it was not open. The holder of an ADT card was required to call American District Telegraph and give his name and ADT number before entering the elevator when it was closed. Dobas, Dean, petitioner and Harold Plaisted, when he was working at the elevator, had ADT cards. Lyle Plaisted did not have an ADT card nor did he ever use anyone else's ADT card to gain access to the elevator of Interior or its successor, Peavey. Until Dean became a party to the grain sales in*277 late 1957, the money received by either Dobas, Harold Plaisted, or petitioner for grain sold to Lyle Plaisted was divided equally among these three individuals. Dean became a party to the grain sales at or about the time Harold Plaisted went to work at Interior's downtown office. During the period from late 1957 until October 1960 when Harold Plaisted was working at Interior's downtown office, the money received by either petitioner or Dobas for grain sold to Lyle Plaisted was divided equally among Dobas, petitioner and Dean. Harold Plaisted did not share in this money. To help alleviate a financial problem of Harold Plaisted's which arose during the period he was working at Interior's downtown office, Dean authorized Harold Plaisted to take a load of sacked grain from the elevator. Pursuant to this authorization, Harold Plaisted, shortly after he was transferred to the downtown office, sold a load of grain to Lyle Plaisted. Neither petitioner, Dobas, nor Dean shared in the proceeds from the sale of this load of grain. The money which Harold Plaisted received for the load of grain sold because of his financial problem was the only money he received for grain sold to Lyle Plaisted*278 which was not shared equally with one or more of the following individuals: petitioner, Dobas and Dean. After Harold Plaisted returned to work at the grain elevator from the downtown office in October 1960 and Dobas severed his employment with Interior, the proceeds of the grain sales to Lyle Plaisted were split equally among Harold Plaisted, Dean and petitioner. After Dobas left the employ of Interior in October 1960, he did not share in the proceeds of grain sales to Lyle Plaisted. 269 If one of the parties to the grain sales was not present when the money received from Lyle Plaisted was divided, his share would be put in an envelope and placed in a file in Dean's office in order that the party not present would receive his share when he returned to the elevator. Petitioner never told Harold Plaisted or Dean that he felt Lyle Plaisted was taking grain from the elevator after it had closed. Petitioner never told Harold Plaisted or Dean that he felt that he was not receiving his share of the proceeds of the grain sales to Lyle Plaisted. During the period from 1957 through 1962, the only grain Lyle Plaisted acquired came from the elevator of Interior or its successor,*279 Peavey. With the exception of spillage which had no value, all of the grain Lyle Plaisted acquired at the elevator of Interior or its successor, Peavey, was purchased from petitioner, Dobas, or Harold Plaisted for $40 a ton. All of the grain which Lyle Plaisted acquired at the elevator of Interior or its successor, Peavey, was sold. Lyle Plaisted kept a record in a notebook of the grain that he sold during the period from 1957 through 1962. He started to keep this record in 1957. Until January 1, 1962, Lyle Plaisted sold the grain which he acquired for $50 a ton and realized a net profit of $10 a ton. After January 1, 1962, Lyle Plaisted sold the grain which he acquired for $55 a ton and realized a net profit of $15 a ton. During the period from 1957 to 1962, Lyle Plaisted sold most of the grain which he acquired to Interstate, which was owned and operated by James M. Vance. Usually, Interstate paid for the grain purchased from Lyle Plaisted by check. On occasion, Interstate made payment with currency. The record which Lyle Plaisted kept discloses that during 1957, he sold grain on the dates and for the amounts shown below: DateAmountJanuary 12, 1957$ 57.70January 8, 195770.00January 7, 1957125.00May 23, 1957103.25June 26, 195795.25August 8, 1957174.25August 3, 195797.05September 9, 1957318.25August 31, 1957191.75October 12, 1957158.50October 2, 1957262.50November 2, 1957286.00October 28, 1957382.50October 25, 1957 276.50 $2,598.50*280 During the years 1957 to 1962, inclusive, Lyle Plaisted received checks in the following total amounts from Interstate for grain acquired from the elevator of Interior or its successor, Peavey, and sold to Interstate: YearTotal of ChecksRe- ceived Duringyear1957$ 2,931.85195834,518.95195933,483.7019604,412.50196132,812.41196216,735.60The checks which Lyle Plaisted received from Interstate in January and February 1958 are as follows: DateAmount1- 4-58$ 216.001- 4-58267.001- 8-58487.251-14-58559.501-18-58306.001-25-58578.002-12-58228.252-13-58432.752-15-58867.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.002-22-58120.502-25-58 238.50Total $4,395.50 The checks which Lyle Plaisted received from Interstate during 1962 are as follows: DateAmount1-11-62$ 1,403.001-12-622,047.003- 9-622,117.004- 2-622,106.604- 2-622,086.004-23-622,112.006- 7-622,081.006- 8-622,100.006-14-62 683.00Total $16,735.60 On two occasions in 1959, Lyle Plaisted sold grain acquired from the elevator of Interior to Lackamas Valley Milling Company, Orchards, Washington, *281 and received the following amounts: DateAmountApr. 28, 1959$110.00Oct. 31, 1959 186.74Total $296.74 On two occasions in 1958, Lyle Plaisted sold grain acquired from the elevator of Interior to Clark County Dairymen's 270 Co-Operative, Battleground, Washington, and received the following amounts: DateAmountMar. 29, 1958$258.50July 8, 1958 82.89Total $341.39 Lyle Plaisted did not report the income which he realized from the grain sales during the years 1957 to 1961, inclusive, on the joint Federal income tax returns which he filed with his wife, June, for the taxable years 1957 to 1961, inclusive. Lyle Plaisted's income tax liability for the years 1957 to 1961, inclusive, was the subject of an investigation by the Internal Revenue Service. On December 31, 1962, Lyle Plaisted and his wife, June, filed amended joint Federal income tax returns for the years 1957 to 1961, inclusive. The income realized from the grain sales was reported on these returns. The income which Lyle Plaisted realized for the grain sales during 1962 was reported on the joint income tax return which he filed with his wife, June, for the*282 taxable year 1962. The gross amounts which Lyle Plaisted realized from the sale of grain acquired at the elevator of Interior and its successor, Peavey, the amounts he paid for this grain (i. e., cost), and his net profits during the years 1957 to 1962, inclusive, are as follows: Gross AmountYearReceivedCostProfit1957$ 2,598.63$ 2,078.90$ 519.73195842,095.1333,676.108,419.03195933,903.0027,122.406,780.6019604,953.253,962.60990.65196137,198.3829,758.707,439.68196218,965.6513,793.205,172.45 The cost shown during each of the years represents amounts paid to Dobas, Harold Plaisted, or petitioner. The last date in 1962 that Lyle Plaisted sold grain was June 13. Petitioner was a party to the grain sales to Lyle Plaisted until such date. During 1960, Dobas (prior to the time he terminated his employment with Interior), petitioner, Dean and Harold Plaisted (after he returned to work at the elevator) were selling grain in addition to that sold to Lyle Plaisted. This grain, which was sacked, was transported by truck to the purchaser, Interstate. The parties to the sales of sacked grain in 1960 spent the proceeds*283 of the sales on lunches and drinks for the parties to the sales, whiskey for use on the premises of the elevator, and entertainment of State and Federal grain inspectors. Some of the whiskey was given to the grain inspectors and the rest was kept by Dean, petitioner, Dobas (until he terminated his employment) and Harold Plaisted (after he returned to the elevator). The State and Federal grain inspectors were in charge of grading grain. The grain inspectors knew that petitioner and others at the elevator were selling grain. A few of the grain inspectors assisted petitioner and the others who were selling grain. Petitioner sold grain to someone other than Lyle Plaisted on four occasions in 1962. The purchaser paid $40 or $50 a ton for the grain and purchased approximately three or four tons on each of the four occasions he acquired grain from petitioner. In December 1962, petitioner knew that Lyle Plaisted's tax liability was being investigated by the Internal Revenue Service and that this investigation related, at least in part, to the grain which Lyle Plaisted was acquiring from the elevator of Interior or its successor, Peavey, and selling. In approximately December 1962 or*284 January 1963, petitioner met with Lyle Plaisted, Dean, Dobas, and Harold Plaisted at the Pagoda Restaurant in Portland. The discussion at this meeting concerned the tax problems of Lyle Plaisted, including the fact that the Government had presented him with checks he had received from the sale of grain. In addition, the subject of amended tax returns was discussed. Petitioner and Catherine Bradbury signed their joint Federal income tax return for the year 1962 on April 14, 1963, a date subsequent to the time when petitioner learned of the Internal Revenue Service's investigation of Lyle Plaisted. During the years 1963 and 1964, after he was aware that the Internal Revenue Service was investigating Lyle Plaisted's tax liability, petitioner continued to appropriate and sell grain from the elevator operation of Peavey. The grain was sold to Lackamas Feed Store, which paid for the grain in currency. The proceeds from such sales, in the amounts of $1,500 and $1,000 for the taxable years 1963 and 1964, respectively, were appropriated or diverted by petitioner to his own personal use. 271 Petitioner did not maintain a record of the amounts received from the sale of grain during*285 the years 1957 to 1964, inclusive. None of the currency received from Lyle Plaisted from the sale of grain during the period from 1957 through 1962 by petitioner, Dobas, Dean, and Harold Plaisted was accounted for or reported to either Interior or Peavey. None of the moneys received from Lyle Plaisted from the sale of grain during the period from 1957 through 1962 were recorded in the books and records of either Interior or Peavey. None of the moneys received from Lyle Plaisted were deposited in bank accounts of Interior or Peavey. None of the income petitioner realized from the sale of grain during the years 1957 to 1964 was reported on the joint Federal income tax returns which petitioner and his wife filed for those years. Petitioner realized that the money he received from the grain sales was taxable. Petitioner did not report the income from the grain sales because he felt that by not reporting this income he was getting away with something. On November 10, 1965, petitioner, Dean and Dobas were indicted in the United States District Court for the Western District of Washington, Southern Division, in Docket No. 17073. Count 1 of the indictment charged petitioner, Dean*286 and Dobas with conspiracy (18 U.S.C. 371) to commit offenses against the United States and to defraud the United States by: (1) evasion of income taxes (26 U.S.C. 7201); (2) theft interstate (18 U.S.C. 659); and (3) interstate communication (18 U.S.C. 1343). The charge relating to income tax evasion stated: That during the period beginning on or about September 1, 1957, and continuing until on or about April 15, 1963, the exact dates being unknown. * * * CLAUDE P. BRADBURY, THOMAS C. DEAN, and HARLAN P. DOBAS did unlawfully, knowingly and wilfully conspire together and with Lyle V. Plaisted and Harold Lee Plaisted to commit offenses against the United States and to defraud the United States in the manner following: A. To commit offenses against the United States by wilfully attempting to evade the income tax due and owing by themselves and by Lyle V. Plaisted and Harold Lee Plaisted by filing and causing to be filed false income tax returns for themselves and for Lyle Plaisted and Harold Lee Plaisted for each of the years 1957, 1958, 1959, 1960, 1961 and 1962, in violation of section 7201 of the Internal Revenue Code*287 of 1954, 26 U.S.C. 7201. Counts 2 through 5 of the indictments charged Dean with evasion of income taxes (26 U.S.C. 7201). On April 8, 1966, petitioner entered a plea of guilty to Count 1 of the indictment. On April 14, 1966, Dean was tried and found guilty on all five counts of the indictment after a three-day jury trial in the United States District Court, Western Distrct of Washington, Southern Division, at Tacoma, Washington. Petitioner testified at Dean's trial with respect to the grain transactions. On their joint Federal income tax returns for the taxable years 1961 and 1962, petitioner and Catherine Bradbury reported gross income in the amounts of $8,738.19 and $9,946.18, respectively. On April 6, 1967, petitioner and Catherine Bradbury, and a delegate of the respondent entered into an agreement by the terms of which the statute of limitations on the assessment of the tax liability of petitioner and Catherine Bradbury for the taxable year ended December 31, 1963, was extended to December 31, 1967. Respondent's notice of deficiency was mailed to petitioners on November 6, 1967. Ultimate Findings 1. Petitioner Claude*288 P. Bradbury realized unreported income from grain sales as follows: YearAmount1957$ 689.61195811,126.7019599,040.8019601,320.8719619,919.5719626,221.882. Petitioner Claude P. Bradbury realized unreported income from grain sales for the years 1963 and 1964 in the respective amounts of $1,500 and $1,000. 3. For each of the years 1957 through 1964 a part of the underpayment of tax was due to fraud with intent on the part of petitioner Claude P. Bradbury to evade tax, and each of the Federal income tax returns for those years was a false and fraudulent return with intent to evade tax. Opinion Issue 1 - Determination of Taxable Income During the years in question the petitioner, acting individually or in conjunction with 272 other individuals, appropriated and sold grain belonging to the grain elevator at which he was employed. The income realized from the grain sales was not reported in the joint Federal income tax returns which petitioner and his wife filed for the years 1957 through 1964. Respondent determined that during the taxable years 1957 to 1962, inclusive, petitioner realized unreported income in the following amounts*289 from grain sales: YearAmount1957$ 781.83195811,225.3619599,040.8019601,320.8719619,919.5719626,221.88 In addition, respondent determined, and the petitioner has conceded, that he realized unreported income from grain sales in the amounts of $1,500 and $1,000 during the taxable years 1963 and 1964, respectively. Petitioner acknowledges that he had unreported income from grain sales but contends that his income from such sources was "less than $20,000" for the years involved. He has not been specific as to the amount of income realized during each of the years. It is clear that the financial gain which petitioner realized as a result of his wrongful activities is includable in his gross income. See section 61(a), Internal Revenue Code of 1954; section 1.61-14(a), Income Tax Regs.; James v. United States, 366 U.S. 213 (1961). We think the evidence in this case establishes that, except for one load of grain sold by Harold Plaisted, all of the money received from Lyle Plaisted for grain was divided equally among the parties to the grain sales at the time of purchase. Harold Plaisted testified that, with*290 the exception of the money for the load he sold individually, all money received from Lyle Plaisted was divided equally with the other parties to the grain sales. Petitioner's testimony at Dean's criminal trial and that of Dobas at the trial of this proceeding concerning the disposition of the money received from Lyle Plaisted is to the same effect. The evidence establishes not only the parties to the grain sales to Lyle Plaisted and the disposition of the money received from these sales, but also the amounts which Lyle Plaisted paid for grain during the period from 1957 through 1962. Lyle Plaisted testified at the trial of this proceeding that the only grain he acquired during the period in question was purchased from either petitioner, Dobas, or Harold Plaisted for $40 a ton and that all of the grain he acquired was sold. He further testified that until January 1, 1962, he sold grain for $50 a ton and that thereafter he received $55 a ton. Lyle Plaisted kept a record of the grain that he sold during the period from 1957 through 1962. He started to keep this record in 1957. In addition, the income which Lyle Plaisted realized from the grain he sold was reported on amended joint*291 Federal income tax returns which he and his wife filed for the years 1957 to 1961, inclusive, and on their original return filed for the year 1962. These returns disclose the gross amounts which he received for grain sold, the cost of the grain, and his net profit. Lyle Plaisted testified that the cost of the grain as shown on his tax returns represented the amounts paid to either petitioner, Dobas, or Harold Plaisted. The evidence contained in this record also establishes other income which petitioner realized from the sale of sacked grain to Interstate and to certain individuals. At the trial of this case the petitioner took the position that his tax liability was affected by purported expenditures for the entertainment of grain inspectors. Dobas, petitioner and Dean testified that money received for grain appropriated from Interior was spent entertaining State and Federal grain inspectors. According to this testimony, the entertainment was for the benefit of Interior because its purpose was to induce the inspectors to grade grain at the elevator in a manner beneficial to Interior. Whether this was the actual purpose of the entertainment is questionable because the grain inspectors*292 were aware of the illicit grain traffic at the elevator. The amount of money spent on, and the frequency of, the entertainment are not shown by the evidence. The only specific source of money for the purported entertainment expenditures identified is that which petitioner and the other employees of Interior realized from the sale of sacked grain in 1960 to Interstate. In resolving the question of the unreported income realized by petitioner from grain sales, no consideration can be given to the purported entertainment of grain inspectors because the evidence relating thereto is too vague and indefinite to 273 support a finding of fact relating to the amounts spent in this manner or the year in which amounts were so expended. Lightsey v. Commissioner, 63 F. 2d 254 (C.A. 3, 1933). Even if a factual finding could be made, the entertainment expenditures would not reduce the amount of gross income petitioner realized from the grain sales. Barbara M. Bailey, 52 T.C. 115 (1969), affd. 420 F. 2d 777 (C.A. 5, 1969). Nor would such expenditures constitute deductions in computing taxable income because it has not been shown that they are ordinary*293 and necessary expenses of employees such as petitioner. Lilly v. Commissioner, 343 U.S. 90 (1952); Deputy v. du Pont, 308 U.S. 488 (1940); Welch v. Helvering, 290 U.S. 111 (1933). It is doubtful that such a showing could be made because expenditures for the purpose of influencing State grain inspectors in the performance of their duties violate Oregon law, and expenditures to influence Federal grain inspectors for a like purpose violate Federal law, Ore. Rev. Stat. §§ 586.250, 586.990 (1953), 70 Stat. 780 (1956), 7 U.S.C. 85 (1964) (now 82 Stat. 767 (1968), 7 U.S.C.A. 87c (1964), and the illegality of the expenditures might preclude their deduction as ordinary and necessary business expenses. Boyle, Flagg & Seaman, Inc., 25 T.C. 43 (1955). In summary, the evidence shows unreported income in the amounts set forth in our ultimate findings of fact with respect to each of the years in issue, and we find no basis for altering these amounts because of the purported expenditures for entertainment of grain inspectors. Issue 2 - Additions to Tax Under Section 6653(b)*294 Petitioner contends that respondent has failed to prove fraud by clear and convincing evidence for any of the years 1957 through 1964, and therefore the additions to tax under section 6653(b) are inapplicable. Respondent counters with the contention that at least a part of the underpayment of tax for each of the years was due to fraud. We agree with the respondent. In our judgment the evidence herein establishes in a clear and convincing manner that the tax underpayments for the years 1957 through 1964 result from fraud with intent to evade taxes on the part of petitioner. The indicia of fraud in this record are as follows: 1. The consistent failure of petitioner to report substantial amounts of income over the 8-year period here involved is highly persuasive evidence of fraudulent intent to evade taxes. Schwarzkopf v. Commissioner, 246 F. 2d 731 (C.A. 3, 1957), affirming a Memorandum Opinion of this Court, Bahoric v. Commissioner, 363 F. 2d 151 (C.A. 9, 1966), affirming a Memorandum Opinion of this Court. 2. Petitioner's failure to report the income from the grain sales is of particular significance because, as established by his unequivocal testimony*295 at the criminal trial of Dean, he knew that this income was taxable to him. His testimony at the trial of this proceeding, although not as straightforward as that which he gave at Dean's trial, also shows that he realized the proceeds from the grain sales were taxable. He testified he realized that money received from grain sales which was spent for his own pleasure was taxable income and that some of the money received from grain sales to Lyle Plaisted was so spent. 3. Another facet bearing on petitioner's knowledge of the taxability of the income from grain sales and his motive for failing to report this income is his action after he became aware of the Internal Revenue Service's investigation of Lyle Plaisted's tax liability. Prior to filing his 1962 income tax return and as early as December 1962, petitioner knew that Lyle Plaisted's tax liability was being investigated and that the investigation was, at least in part, concerned with the tax consequences of the sale of grain acquired from petitioner and other employees of the grain elevator. Although aware of this investigation, petitioner continued to appropriate and sell grain belonging to his employer and failed to report*296 his correct taxable income on his tax returns filed after he had knowledge of the investigation. The inference we draw from this flagrant action is an intent to evade payment of income taxes. 4. If there were doubt, which there is not, as to the reason why petitioner failed to report the income from the grain sales, such doubt was eliminated by petitioner's testimony at Dean's trial. In response to a question relating to whether there was a reason why he failed to report the income from the grain sales to Lyle Plaisted, 274 petitioner stated, "No, I guess I just figured I was getting away with something." This testimony, which obviously related to the taxable years 1957 to 1962, inclusive, is tantamount to an admission by petitioner that the failure to report the income from the grain sales during these years was dictated by a desire to evade the payment of income taxes. Further, the record of this proceeding establishes that the same motive caused the tax underpayments which exist for the years 1963 and 1964. 5. Petitioner was under an obligation to maintain books and records adequate for the computation of his tax liability. Section 1.6001-1, Income Tax Regs. In violation*297 of this duty, petitioner failed to keep a record of the grain sales and the income he realized therefrom. His failure to keep records indicates a desire to conceal the existence of the income from the grain sales and is evidence of his fraudulent intent. Estate of Upshaw v. Commissioner, 416 F. 2d 737 (C.A. 7, 1969), certiorari denied 397 U.S. 962 (1970); John Harper, 54 T.C. 1121 (1970). 6. Evidence of petitioner's fraudulent intent is found in the mode of payment for all grain which he sold. The evidence shows that payment for substantially all the grain sold during the period here in question was made in cash. Transactions conducted in this manner are evidence of an intent to conceal the existence of income and evade tax. Luerana Pigman, 31 T.C. 356 (1958). 7. On November 10, 1965, petitioner, Dean and Dobas were indicted in the United States District Court for the Western District of Washington, Southern Division, in Docket No. 17073. Count 1 of the indictment charged these individuals with conspiracy (180 U.S.C. 371) to commit offenses against the United States and to defraud the United States by: *298 (1) evasion of income taxes (26 U.S.C. 7201); (2) theft interstate (18 U.S.C. 659); and (3) interstate communication (18 U.S.C. 1343). On April 8, 1966, petitioner entered a plea of guilty to the charge brought against him, which included income tax evasion for the years 1957 to 1962, inclusive. This was an admission against interest. Cf. Leon Papineau, 28 T.C. 54 (1957). Issue 3 - Statute of Limitations The second amended petition filed by petitioners in this proceeding alleges that the statute of limitations bars the assessment and collection of deficiencies determined for the taxable years 1957 through 1962 and 1964. There is no basis for the allegations pertaining to the year 1964 because the statutory notice which determined a deficiency for that year was issued within three years from the date the 1964 income tax return was filed. Section 6501(a). With respect to the taxable years 1957 through 1962, the tax liabilities may be assessed at any time because of our determination that a part of the underpayment of tax in each of those years was due to fraud with intent to evade tax. Section 6501(c)(1). *299 After this case was tried and briefed, the parties filed a joint motion for leave to file an additional stipulation. The motion was granted because, after the trial of the case, sections 6013 and 6653, Internal Revenue Code of 1954, were amended by Public Law 91-679, 84 Stat. 2063. The post-trial stipulation of the parties reads as follows: 1. Section 6013(e) of the Internal Revenue Code of 1954 is not applicable to this case. 2. If the Court determines that the addition to tax for fraud is applicable to any or all of the taxable years for which the fraud penalty is in issue, petitioner Catherine Bradbury is not liable for the addition to tax for fraud or additions to tax for fraud determined by the Court. Accordingly, we hold that petitioner Catherine Bradbury is jointly and severally liable for the deficiencies determined herein, but is not liable for any additions to tax under section 6653(b) for the years involved. To reflect the conclusions reached herein and certain concessions, Decision will be entered under Rule 50.